UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLEY GOODMAN,<br><br>            Plaintiff,<br><br>    v.<br><br>NANCY BERRYHILL,[1]<br><br>            Defendant. | Case No. 16-cv-02678-JSC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION AND REMANDING**<br><br>Re: Dkt. Nos. 11 & 17 |

Plaintiff Coley Fernandez Goodman ("Plaintiff") seeks social security benefits for depression and suicidal tendencies. Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his benefits claim. Now before the Court is Plaintiff's Motion for Summary Judgment or Remand and Defendant's cross-motion for summary judgment. (Dkt. Nos. 11 & 17.) Because the Administrative Law Judge ("ALJ") improperly weighed the medical evidence and erred in discrediting and selectively relying on the evidence in the treatment notes, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for further proceedings consistent with this Order.[2]

## LEGAL STANDARD

A claimant is considered "disabled" under the Social Security Act if he meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017 and is therefore substituted for Carolyn Colvin as the Defendant in this action. *See* 42 U.S.C. § 405(g); Fed.R.Civ.P. 25(d). This Order refers to Berryhill as the "Commissioner."
[2] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1), to conduct all further proceedings in this case, including entry of final judgment (Dkt. Nos. 6 & 7.)

United States District Court<br>Northern District of California

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that he is unable to do his previous work and cannot, based on his age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## ADMINISTRATIVE RECORD

Plaintiff was born on September 15, 1961 and grew up in the Miami/South Carolina area. (Administrative Record ("AR") AR 94.) Plaintiff has suffered from depression for many years. He has attempted suicide twice: the first time in the 1990's and the second time in 2012. (AR 431, 488.) Plaintiff is gay, and has never married or had any children. (AR 492.) He currently lives alone. (AR 256.) Plaintiff alleges he became disabled on October 1, 2011. (AR 216.) Prior to his alleged onset, Plaintiff worked as an administrative assistant, security guard, and most recently as a certified nursing assistant at an adult day center. (AR 251.)

On November 6, 2013, Plaintiff filed for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act, respectively. (AR 140-148.) The Social Security Administration denied Plaintiff's application initially and at reconsideration. (AR 1-3, 140-148.) On July 7, 2015, an ALJ held a hearing where Plaintiff, a medical expert, and vocational expert testified. (AR 15-33.) The ALJ subsequently issued a decision denying Plaintiff's application, finding that Plaintiff was not disabled. (*Id.*) Thereafter, the Appeals Commission denied review making the ALJ's decision final. (AR 1-4.)

United States District Court
Northern District of California

Plaintiff commenced this action for judicial review on May 5, 2016 pursuant to 42 U.S.C. § 405(g).

## I. Medical Evidence

Plaintiff has seen a variety of medical professionals in connection with his psychiatric conditions. A discussion of the relevant medical evidence follows.

### A. <u>Medical History</u>

#### 1. *Prior to October 1, 2011*

Plaintiff first sought treatment for mental health issues in May 2007 from the San Francisco Department of Personal Assisted Employment Services' Counseling Services ("PAES"), to help him deal with the loss of his mother earlier that year. (AR 523-528.) A provider there diagnosed Plaintiff with "bereavement." (AR 527.) From 2007-2009, Plaintiff saw a number of PAES counselors, including counselors Kamtha Keow and Carrie Lagenbach. (AR 298-410, 510-527, 537-596.) Plaintiff consistently reported grief over the death of his mother. (*Id*.)

#### 2. *October 1, 2011 to July 7, 2015*

Although Plaintiff's disability onset date is October 1, 2011, there is no medical evidence in the record for the period of October 2011 to August 2013. Other than a few documents predating Plaintiff's disability onset date, the medical evidence begins with a September 11, 2013 Disability Services evaluation, wherein Plaintiff stated he "just can't take it anymore." (AR 431.) Disability Services contacted San Francisco General Hospital Psychiatric Emergency Services. The hospital placed Plaintiff on a "5150" psychiatric hold and admitted him to the hospital for "crisis stabilization." (*Id*.; AR 488.) The admission report noted that Plaintiff was "irritable, anxious, distraught, clenching hands over his head, agitated and rocking in his seat . . . uncooperative with interview refuses to answer further, threatening 'If you keep talking I'm going to hurt you...Stop asking me all this!'" (AR 440.) Plaintiff was prescribed Ativan because he was "agitated, threatening."[3] (AR 432.) The hospital discharged Plaintiff the next day. (AR 442.)

---

[3] Ativan is a benzodiazepine used to treat anxiety disorders. Ativan, DRUGS.com, https://www.drugs.com/ativan.html (last visited January 31, 2017).

1    A few days later, Plaintiff began receiving counseling and psychiatric care at South of

2  Market Outpatient Health Center (the "Health Center"). (AR 491-92.) Through the Health

3  Center, Plaintiff began seeing therapist Natalie Henry-Berry, LCSW on a bi-monthly basis, and

4  psychiatrist Dr. Steven Wozniak on a monthly basis. (AR 48.) Plaintiff also received treatment

5  on a monthly basis for medication management and psychotherapy purposes. (*Id.*) During his

6  first appointment with Ms. Henry-Berry, Plaintiff stated he was "seeking treatment for depression

7  after being in SF for the last 7 years and being mainly isolated, unemployed, at risk of

8  homelessness with poverty." (AR 468.) Plaintiff further stated he "just can't put in for another

9  job application and get another no." (*Id.*) At around the same time, Plaintiff began seeing Dr.

10 Wozniak who prescribed Plaintiff Fluoxetine.[4] (AR 496.)

11    During their first few meetings, Ms. Henry-Barry described Plaintiff as "cooperative,

12 adequately groomed but odorous[.]" (AR 468, 469, 471.) Then, in November 2013, Dr. Wozniak

13 and Ms. Henry-Barry placed Plaintiff on a second "5150" psychiatric hold after he showed up to

14 his appointment and "described having '41 personalities' and seemed to indicate that these were in

15 conflict." (AR 472-473.) He endorsed suicidal ideation and agreed with the plan of going to the

16 hospital." (*Id.*) Plaintiff stated he felt "better and less overwhelmed" after spending the night in

17 the hospital. (AR 474-75.)

18    Plaintiff continued to see both Dr. Wozniak and Ms. Henry-Berry on a consistent basis.

19 (AR 476-496.) In December 2013, Ms. Henry-Berry noted Plaintiff was "in good spirits on this

20 date but continues to struggle with trying to maintain housing. He reports ongoing depression,

21 problematic relationships, and the inability to get many of his needs met[.]" (AR 479.) In a

22 subsequent appointment, Plaintiff reported he was "better but still down." (AR 480.) When Ms.

23 Henry-Berry discussed possible vocational training, Plaintiff replied "I just can't get myself to

24 look for jobs, I have no energy...I don't want to be around people...I am tired, I have been

25 working since I was 7 yo in the fields of South Carolina." (AR 486.) In April 2014, Ms. Henry-

---

[4] Fluoxetine is the generic form of antidepressant, Prozac, used to treat is used to treat major depressive disorder, bulimia nervosa, obsessive-compulsive disorder, panic disorder, and premenstrual dysphoric disorder (PMDD). See Fluoxetine, Drugs.com, https://www.drugs.com/fluoxetine.html (last visited Jan 31, 2017)

Berry reported that Plaintiff "continues to report he is in no condition to work and prefer to be in his current position than go out and seek employment. He feels mentally unable to be in an employment environment at this time." (AR 625.) A month later, Dr. Wozniak reported that Plaintiff "remains down but not as bad as before" and his mood was "depressed though better[.]" Dr. Wozniak reported Plaintiff "continues to have significant functional impairment due to depression" and increased his Fluoxetine dose. (AR 629.)

Throughout 2014, Ms. Henry-Berry described Plaintiff as "cooperative, [and] adequately groomed[.]" (AR 625, 628, 631, 633, 635, 637, 642, 644, 649, 652.) In June 2014, Dr. Wozniak prescribed Plaintiff Wellbutrin XL as "add-on therapy" to Fluoxetine.[5] (AR 632.) In July 2014, Dr. Wozniak stated "[Plaintiff] still unable to work due to severity of psychiatric symptoms . . . [] Client has partially responded to medication therapy. Likely symptoms remain so severe due to heave [sic] level of stressors." (AR 634.) Dr. Wozniak increased Plaintiff's Wellbutrin XL dose. (*Id.*) After a few months on his adjusted medication, Dr. Wozniak reported that although Plaintiff's "mood is better" he "feels unsatisfied with his routine now that he has stable housing and acute depressive symptoms are largely resolved." Dr. Wozniak "explored with [Plaintiff] ways to increase community contact and decrease isolation . . . [Plaintiff] seemed engaged with the idea and responded well." (AR 640.) Plaintiff continued reporting progress with his medications, "[Plaintiff] feels somewhat better with fluoxetine dose. [] 'I'm good more days than not' . . . mood 'better than not[.]'" (AR 627.) Then, in May 2015, Dr. Wozniak noted, "[d]epressive symptoms persist despite fairly consistent med adherence. Significant functional impairments as a result. Will recommend Abilify[6] to augment [F]luoxetine and Wellbutrin XL." (AR 653.)

## B. Medical Evaluations

In addition to routine and emergency medical visits, Plaintiff underwent several examinations to determine his functional capacity in support of his application for disability

---

[5] Wellbutrin is an antidepressant used to treat major depressive disorder and seasonal affective disorder. Wellbutrin, Drugs.com (https://www.drugs.com/wellbutrin.html) (last visited Feb. 1, 2017).
[6] Abilify is an antipsychotic used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar I disorder. Abilify, Drugs.com (https://www.drugs.com/abilify.html) (last visited Feb. 8, 2017).

benefits.  Below is a summary of these evaluations.

### 1.    *Rauderic De Silva, MFT*

In September 2013, Mr. De Silva completed an Assessment Report of Plaintiff in connection to his admission to the South of Market Outpatient Health Center.  (AR 491.)  Mr. De Silva diagnosed Plaintiff with "Depressive Disorder NOS" and a Global Assessment Functioning ("GAF") scores of 45 to 48 — on a scale of 41-50 — indicating "Serious Symptoms or Impairment[.]"  (AR 491.)

### 2.    *Treating Psychiatrist Dr. Wozniak and Therapist Henry-Berry*

#### a.    The July 2014 Mental Functional Assessment

Dr. Wozniak and Ms. Henry-Berry completed two evaluations of Plaintiff.  In July 2014, the practitioners completed a Mental Functional Assessment.  (AR 597-598.)  They noted Plaintiff had moderate impairments with activities of daily living, moderate impairments with social functioning, moderate impairments with concentration, persistence, and pace, and a marked limitation in his ability to adapt to work type settings.  (*Id*.)  Specifically, they noted Plaintiff had "low mood, lack of interest, lack of energy, sleep problems, poor concentration, lack of appetite, frequent SI w/ past attempts."  (*Id*. at 597.)

#### b.    The April 2015 Mental Disorder Assessment

A little less than a year later, in April 2015, Dr. Wozniak and Ms. Henry-Berry completed a Mental Disorder Assessment (AR 600-602) which diagnosed Plaintiff with Major Depressive Disorder Recurrent Moderate and noted that "treatment has relieved sxs of depression but client does have intermittent low moods that can be disabling."  (AR 600.)  Their joint functional assessment listed Plaintiff as being markedly limited in all categories.  (*Id*.)  In particular, they noted that "[Plaintiff's] depressive episodes leave him unable to function adequately.  He becomes tearful distraught + unable to verbalize. [Plaintiff] becomes easily overwhelmed, stressed and have (sic) difficulty stabilizing."  (*Id*. at 601.)  Regarding his ability to work, they reported that "[Plaintiff's] depressive sxs have left him unable to socialize, concentrate + maintain relationships. [Plaintiff] would not do well in a work environment due to his symptoms + reports ongoing sadness + SI when facts with stressful situations."  (*Id*. at 602.)

### 3. *Cindy Le, M.D.*

Dr. Le evaluated Plaintiff on September 11, 2013 at San Francisco General Hospital after Plaintiff's treating psychiatrist, Dr. Wozniak, placed him on a "5150" psychiatric hold. (AR 440-441.) Dr. Le assessed Plaintiff's GAF score as 25, indicating serious impairment in communication or judgment. (AR 440-441.)

### 4. *State Agency Non-Examining Consultants*

State agency reviewing psychological consultants, Drs. Fair and Kaspar, reviewed Plaintiff's psychiatric and medical records and completed Medically Determinable Impairments and Severity Assessments in 2014 in connection with the SSA's disability determination at both the initial and reconsideration levels. (AR 94-114, 117-136.) Both doctors assessed Plaintiff as having moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (AR 99, 124.) Dr. Fair opined that Plaintiff would be able to perform "simple, unskilled work in a setting with minimal contact with others." (AR 96.) Dr. Kaspar similarly opined that Plaintiff "should be able to sustain simple tasks in a low social demand work setting. (AR 132.)

## II. Plaintiff's ALJ Hearing

On July 7, 2015, Plaintiff appeared with counsel at his scheduled hearing before ALJ Judson Scott. (AR 36.) Plaintiff, Medical Expert ("ME") Dr. John Simonds, and Vocational Expert ("VE") Michael Frank all testified at the hearing. (AR 36.)

### A. <u>Plaintiff's Testimony</u>

Plaintiff is suffering from major depressive disorder. (AR 54.) Plaintiff sees Therapist Natalie-Henry Berry twice a month for therapy and psychiatrist Dr. Wozniak once a month for medication management. (AR 48.) Dr. Wozniak prescribed Plaintiff the generic versions of Prozac[7] and Wellbutrin, along with Abilify. (AR 45.) Plaintiff is currently taking the maximum recommended dose of both Prozac and Wellbutrin. (*Id*.) The medications provide Plaintiff some relief from his symptoms, however, he still has not been able to get "reasonable control" of them.

---

[7] Prozac is an antidepressant used to treat major depressive disorder, bulimia nervosa (an eating disorder), obsessive-compulsive disorder, and panic disorder. Prozac, Drugs.com (https://www.drugs.com/prozac.html) (last visited Apr. 13, 2017).

(AR 46.)  The medication makes Plaintiff feel "foggy and sleepy" and causes him to "nod[] off" during the day (AR 46, 50); however, he has trouble sleeping at night and only gets approximately three hours of sleep during a 24-hour period.  (AR 50.)  The medication also produces suicidal thoughts.  (AR 57.)  Plaintiff has attempted suicide several times; two of these attempts have resulted in trips to the hospital.  (*Id*.)  Plaintiff's last suicide attempt was "eight to nine months ago."  (*Id*.)  Plaintiff cannot return to work as a certified nursing assistant because of the side effects of the medication, including drowsiness and irritability. (AR 42-44.)  Even if Plaintiff wanted to continue working as a certified nursing assistant, there are no more available positions left in San Francisco.  (AR 52-53.)  Plaintiff has tried finding other work but couldn't find any jobs he was qualified to do.  (AR 52.)  He is also concerned about "lashing out" at people and subsequently becoming homeless as a result.  (AR 53.)  The last time Plaintiff looked for work was approximately a year and a half to two years ago.  (AR 54.)

Plaintiff's depression has produced a number of other side effects beyond the drowsiness and irritability.  (AR 59-61.)  He has lost 2 or 3 pounds due to decreased appetite.  (AR 59.) Plaintiff also experiences anxiety and has a fear of people such that he doesn't want to ride the bus anymore.  (*Id*.)  Plaintiff has trouble keeping up with his hygiene, and typically only bathes every 2 months.  (*Id*.)

### B. __Medical Expert's Testimony__

At the ALJ's request, Medical Expert (ME) Dr. John Simonds, M.D. listened to Plaintiff's testimony, reviewed his medical records, and subsequently testified regarding Plaintiff's medically determinable impairments and whether or not he was able to work in any capacity.  (AR 64-80.) The ME opined that Plaintiff suffered from major depressive disorder, moderate, from the alleged onset date, October 2011.  (AR 64-65, 67.)  He determined that Plaintiff had moderate restrictions with the activities of daily living, moderate restrictions with social interaction, and mild to moderate restrictions with concentration, and no decompensations.  (AR 71.)  The ME concluded that Plaintiff could handle "simple repetitive through detailed work," and, after questioning by the ALJ, testified that Plaintiff could perform some "mildly complex work" given his education and vocational training.  (AR 72.)  The ME went on to state that Plaintiff was best suited for

"occasional superficial contact with other workers" in a job "without much supervision" and "lower stress levels." (AR 74.) The ME opined that Plaintiff would be capable of dealing with the "ordinary stress" of a job if it was "suited [to] all the limitations we've discussed[.]" (AR 75.) Lastly, the ME opined that Plaintiff "has responded to the medication and the counseling with an improvement in his mood and depression . . . [and] there seems to be evidence that that (sic) is definitely on the upswing[.]" (AR 76-77.) He therefore concluded that if Plaintiff continued his treatment plan, he would be able to maintain normal workplace attendance.

### C.     Vocational Expert's Testimony

Vocational expert (VE) Michael Frank testified at the request of the ALJ after reviewing Plaintiff's file, including past medical and psychiatric history. (AR 84-92.) The VE classified Plaintiff's prior work as (1) a sedentary administrative assistant; (2) a light strength security guard; and (3) a medium strength nurse assistant. (AR 84.) In order to determine whether Plaintiff was qualified to perform past relevant work, the ALJ asked the VE to assume a hypothetical individual who has:

> [N]o exertional limitations; but from a mental perspective, has the capacity to work at the range of simple repetitive through mildly complex work . . . [i]s able to work occasionally with coworkers in a superficial setting, not as a team member. Supervisory contact can be frequent if needed, although can also work independently. Public contact is superficial intermittent contact . . . is able to handle the stress of -- that would come along with the types of jobs that are described as defined, is able to maintain concentration and stay on task with the same kind of work as defined, and maintain also normal attendance, workplace attendance with that defined type of work.

(AR 84-85.) The VE opined that a person with those restrictions "maybe [] could be a security guard." (AR 85.) Upon further ALJ questioning , the VE stated that Plaintiff could also perform (1) medium work as a cleaner II (DOT 919.687-014) (of which 808 jobs exist locally), (2) medium work as an industrial cleaner (DOT 381.687-018) (of which 4,000 jobs exist locally), and (3) medium work as an order filler (DOT 922.687-058) (of which 2,100 jobs exist locally). (AR 86-88.) In response to Plaintiff's attorney, the VE conceded that if the hypothetical individual had severe or marked limitations for every worker trait, then there could be "no work [] at that point." (AR 91.)

### III.    ALJ'S Findings

On October 21, 2015, the ALJ completed the five-step disability analysis and found Plaintiff not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (AR 28.)  At the first step, he found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 1, 2011.  (*Id*. at 20.)  At the second step, the ALJ determined that Plaintiff had a severe impairment of major depressive disorder.  (AR 20-21.)  At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (AR 21.)  In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied; in other words, whether Plaintiff's mental impairment resulted in at least two of the following: "marked restrictions of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining social concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  (*Id*.)  The ALJ also found that Plaintiff did not satisfy the "paragraph C" criteria because he did not have a medically documented history of a chronic affective disorder that lasted at least two years and "caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support."  (*Id*.)  In addition, the ALJ determined that Plaintiff failed to show one of the following: "repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  (*Id*.)

As a precursor to the fourth step, the ALJ determined Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but for the following non-exertional limitations: Plaintiff can perform simple repetitive through detailed work; occasionally work with coworkers in a superficial setting but not as a team member; and have frequent contact with supervisors and intermittent, superficial contact with the public.  (AR 22.)  In making this

finding, the ALJ considered Plaintiff's symptoms and the extent to which they are consistent with the objective medical evidence and other evidence by adhering to a two-step process. (*Id.*) First, he determined whether Plaintiff had an underlying medically determinable physical or mental impairment(s) that could be reasonably expected to produce Plaintiff's pain or other symptoms; and second, he evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functioning. (*Id.*) In analyzing the first step, the ALJ noted Plaintiff's subjective complaints including severe depression, suicidal thoughts, panic attacks, anxiety and mood swings, in addition to his difficulty with activities of daily living due to low energy, lack of interest, low mood, and anxiety. (*Id.*) Finally, the ALJ noted that Plaintiff's medication — Prozac, Wellbutrin, and Abilify — make Plaintiff sleepy, however they do provide him some relief. (*Id.*) After considering the above facts, the ALJ found that Plaintiff had satisfied step one; his medically determinable impairment could reasonably be expected to cause his alleged symptoms.

Next, the ALJ turned to step two. (AR 22.) He found that Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not entirely credible, for the following reasons: first, other than a brief episode in September 2013 during which Plaintiff was hospitalized for anger, threatening to harm others and suicidal ideation—Plaintiff's mental status evaluations were generally within normal limits. (AR 22-23.) Specifically, Plaintiff's treaters frequently assessed Plaintiff as having "appropriate dress, adequate grooming, polite and cooperative manner, fair eye contact . . . neutral mood and affect . . . good judgment and insight . . . normal perceptions, no psychosis, good impulse control, and no suicidal or homicidal ideation." (*Id.*) Additionally, Plaintiff's treaters "repeatedly assessed normal risk, stated that the claimant was 'not dangerous,' and generally described the claimant's depression as moderate." (*Id.*) The ALJ found that Plaintiff's exacerbated symptoms "occurred in the context of concrete life stressors, such as unemployment, lack of income, and housing difficulties. (*Id.*) The ALJ identified that Plaintiff was able to live alone and could somewhat maintain his own personal care, seek out resources when needed, attend his therapy and psychiatric appointments, make simple meals for himself, and use public transportation, indicating "at most moderate difficulties in

maintaining social functioning. (*Id.*) Plaintiff could also pay bills, manage a savings account, and apply for jobs after the alleged onset date, which was "consistent with at most moderate difficulties in maintain concentration, persistence, or pace." (AR 23.) Focusing on Plaintiff's employment history, the ALJ emphasized that in October 2013, Plaintiff told a treater that he was having difficulty finding a job because he did not have adequate employment skills, "strongly suggesting he may be unemployed for reasons other than functional limitations arising from his impairments." (AR 24.) The ALJ also averred that at the hearing, Plaintiff stated that he continued to search for a job until "a year and a half or two years ago . . . and he wanted to work as a certified nursing assistant, but the jobs have 'disappeared,' again suggesting that he could work if given a job." (*Id.*)

The ALJ next focused on the testimony of the ME, Dr. John Simonds, who opined at the hearing that "[Plaintiff]'s impairments do not equal or meet a listing" and, based on the record, Plaintiff has "moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace." (*Id.*) The ALJ noted that the ME testified that Plaintiff could handle "simple through mildly complex work, occasional superficial interactions with coworkers if not working on a team, frequent interactions with supervisors, and superficial public contact, though not on a regular basis." (*Id.*) The ALJ found the ME's testimony was "based on and consistent with a thorough review of the entire medical record, including minimal abnormal objective findings on mental status evaluation and consideration of the [Plaintiff]'s subjective symptoms and difficulties to the extent consistent with the objective evidence." (*Id.*) Accordingly, the ALJ afforded the ME's testimony "great weight." (*Id.*)

The ALJ then addressed the report that treating psychiatrist Dr. Wozniak completed in 2014, similarly assessing Plaintiff as having moderate restriction of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (AR 24.) The ALJ also afforded this opinion "great weight" because it was "consistent with [the ME's] objective findings, including some depressive findings and otherwise largely normal mental status evaluations, and adequately considers the [Plaintiff]'s

subjective symptoms and difficulties with daily activities." (*Id*.) The ALJ did not mention Dr. Wozniak's opinion in the same assessment of Plaintiff's "marked" impairment to adapt to work type settings.

The ALJ then moved onto the opinions of the State agency psychological consultants. In accordance with the ME's report, the consultants collectively opined that Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace. (*Id*.) However, unlike the ME, the consultants also opined that Plaintiff had one or two episodes of decompensation, each of extended duration. (*Id*.) The consultants concluded that Plaintiff can "understand and remember simple instructions; focus, attend, concentrate, and persevere on simple, repetitive work over an extended period of time; preferably work in a setting with minimal demand for social contact; and adapt to changes in a simple work environment." (*Id*.) The ALJ gave great weight to the opinions of the consultants to the extent their opinions were consistent with the ME's opinion, however he found that the Plaintiff's "daily activities, articulate and polite presentation at the hearing, and largely normal objective findings on mental status evaluation are more consistent with the capacity to perform up to mildly complex work and work with others as described in the residual functional capacity." (AR 24.) He also found "insufficient evidence" of episodes of decompensation since Plaintiff's alleged onset date. (*Id*.)

The ALJ's analysis then backtracked to 2013 when Plaintiff began seeing Dr. Wozniak and Ms. Henry-Berry, specifically focusing on a report that Dr. Wozniak completed in December 2013, a few months after he began treating Plaintiff. (AR 25, 446.) The ALJ summarized Dr. Wozniak's report, "[Plaintiff] had difficulty with daily living, due to his depressive symptoms, as well as sometimes needing to get off the bus, due to overcrowding . . . able to follow simple instructions, but not more complex ones . . . could not tolerate an eight-hour shift, due to interpersonal stress; and he would struggle with decision making, task completion, and more complex decision making." (AR 25.) The ALJ afforded this report "some weight" but only "to the extent that it is consistent with the above moderate paragraph B findings and associated limitations outlined in the residual functional capacity." (*Id*.) He noted that "a finding of

disability is one reserved for the Commissioner . . . and Dr. Wozniak does not consider whether [Plaintiff] can work an eight-hour shift when restricted in his contact with others, thereby reducing interpersonal stress." (*Id*.) He also notes that "[Plaintiff]'s relatively intact daily functioning, including his ability to articulately answer the function report questionnaire and handle funds, are more consistent with the capacity to perform simple repetitive through at least detailed work." (*Id*.)

The analysis then jumped backwards again to September 2013, when Dr. Wozniak and treating therapist Rauderic De Silva completed a Global Assessment of Functioning ("GAF") of Plaintiff upon his admission to South of Market Outpatient Medical Center. (*Id*.) Both treaters assessed Plaintiff as having GAF scores between 45 to 48, which indicate serious symptoms or impairments. (AR 25.) The ALJ afforded the scores "little weight" because they were "inconsistent with the generally minimal objective findings on mental status evaluation . . . as well as the moderate limitations assessed by Dr. Wozniak." He also found them to be "inconsistent with the [Plaintiff]'s wide range of daily activities, which is more consistent with moderate symptoms or impairment." (*Id*.)

The ALJ then summarized the rest of Plaintiff's treatment history, beginning with a report that Dr. Wozniak and Ms. Henry-Berry had jointly completed in April 2015. (*Id*.) The report stated that Plaintiff had marked limitations in all work-related mental activities and that Plaintiff "would not do well in a work environment due to his symptoms." (AR 602.) The ALJ identified these symptoms as "an inability to socialize, concentrate, and maintain relationships, as well as ongoing sadness and suicidal ideation when faced with stressful situations." (AR 25.) The ALJ referred to the report as "Ms. Henry-Berry's opinion" and afforded it "little weight because it cites little in the way of objective findings, largely mentioning only occasional depressed and tearful presentation and mood instability, and appears to be primarily based on the [Plaintiff]'s subjective symptoms." (*Id*.) He also found the report "inconsistent with the above-discussed largely normal findings on mental status evaluation, including Ms. Henry-Barry's own treating notes throughout the record, as well as [Plaintiff]'s relatively intact daily activities and documented significant improvement on prescribed psychotropic medication." (*Id*.)

14

Concluding his analysis of Plaintiff's residual functional capacity, the ALJ referenced a September 2013 incident where Plaintiff was hospitalized for suicidal ideation. After threatening to harm treating doctor Cindy Le, M.D. Dr. Le assessed Plaintiff as having a GAF score of 25, indicating serious impairment in communication or judgment. (*Id*.) The ALJ afforded this score "little weight" because it is merely "a snapshot of the [Plaintiff]'s condition at a given moment" and "inconsistent with the [Plaintiff]'s overall condition during the period at issue[.]" (*Id*.)

Next, the ALJ turned to step four: whether Plaintiff is able to perform any past relevant work. (AR 26.) Plaintiff worked as an administrative assistant from 1999 to 2000, a security guard from 2009 to 2010, and as a nurse assistant from December 2010 to October 2011. (*Id*.) Of those three jobs, only the administrative assistant position counted as substantial gainful activity and thus, as past relevant work. (*Id*.) The ALJ found that Plaintiff was unable to perform any past relevant work based on the VE's testimony that it exceeded his residual functional capacity. (AR 26-27.)

Finally, the ALJ addressed step five, whether Plaintiff is able to perform any other work. (*Id*.) The ALJ considered Plaintiff's age, education, work experience, and residual functional capacity, in conjunction with the Medical-Vocational Guidelines. (*Id*.) If the Plaintiff "can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of 'disabled' or 'not disabled' depending on the [Plaintiff]'s specific vocational profile." (*Id*.) The ALJ found that Plaintiff had nonexertional limitations so the guidelines were not dispositive; instead, they functioned as a framework for the decision. (*Id*.) The ALJ turned to the VE testimony to determine the extent that Plaintiff's limitations "erode the occupational base of unskilled work at all exertional levels." (*Id*.) The VE opined that Plaintiff could perform the requirements of the following representative occupations: cleaner II (DOT 919.687-014, medium, SVP 1; 5,600 jobs nationally and 800 statewide), industrial cleaner (DOT 381.687-018, medium, SVP 2; 39,000 jobs nationally and 4,000 statewide), and order filler (DOT 922.687-058, medium, SVP 2; 426,000 jobs nationally and 2,100 statewide). (AR 27.) Accordingly, the ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was not disabled under

the Medical Vocational Guidelines.  (AR 28.)

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to deny benefits.  When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a preponderance." *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted); *see also Andrews*, 53 F.3d at 1039.  To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.").)

Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are roles reserved for the ALJ. *See Andrews*, 53 F.3d at 1039; *Magallanes*, 881 F.2d at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Comm'r*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").)  "The court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08–CV–00147–BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

United States District Court
Northern District of California

**DISCUSSION**

**I.     The ALJ's Consideration of Medical Opinion Evidence**

Plaintiff contends that the ALJ erred as a matter of law by improperly weighing the medical opinion evidence—specifically by affording little weight to the opinions of Plaintiff's treating psychiatrist and therapist—and selectively relying on evidence in the treatment notes indicating improvement while rejecting other evidence.

**A.     Legal Standard**

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn*, 495 F.3d at 631. If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations and quotations omitted).

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate

reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 795 F.3d at 1012-13 (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence." *Hill*, 698 F.3d at 1159 (internal citations omitted). "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings. *See, e.g., Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey,* 849 F.2d at 422.

### B. <u>Analysis</u>

To reject the opinions of Plaintiff's treating psychiatrist, Dr. Wozniak, and treating therapist, Ms. Henry-Berry, in favor of those of the ME and non-examining consultants, the ALJ must provide specific and legitimate reasons supported by substantial evidence for doing so. *See Lester*, 81 F.3d at 830. The ALJ did not do so.

Plaintiff began seeing Dr. Wozniak and Ms. Henry -Berry in 2013 (AR 468, 470) and saw both providers on a monthly and bi-monthly basis, respectively, through a few months prior to this hearing. (AR 48, 653.) Over the course of Plaintiff's treatment, Dr. Wozniak and Ms. Henry-Berry completed two joint assessments; in the first assessment the pair evaluated Plaintiff as markedly limited in his ability to adapt to a work type setting and moderately limited in all other categories. (AR 597-599.) In their second, subsequent assessment nine months later Plaintiff's treaters assessed him as markedly limited in all categories, including in his ability to adapt to a work type setting. (AR 600-602.) The treaters noted that Plaintiff's "depressive episodes leaves him unable to function adequately. He becomes tearful, distraught + unable to verbalize. [Plaintiff] becomes easily overwhelmed, stressed and have (sic) difficulty stabilizing." (AR 601.) In the same assessment they also noted that Plaintiff "would not do well in a work environment" as his

"depressive symptoms have left him unable to socialize, concentrate + maintain relationships."
(*Id.*)

The ALJ afforded the first assessment great weight because it was "based on and consistent with a thorough review of the entire medical record, including minimal abnormal objective findings on mental status evaluation and consideration of the claimant's subjective symptoms and difficulties to the extent consistent with the objective evidence." (AR 24.) Despite affording the assessment great weight, the ALJ ignored the marked limitation in Plaintiff's ability to adjust to a work-type setting. (AR 24.) The ALJ conversely afforded the second assessment little weight, because the ALJ determined it was "inconsistent with the above-discussed largely normal findings on mental status evaluation, including Ms. Henry-Berry's own treating notes throughout the record, as well as the claimant's relatively intact daily activities and documented significant improvement on psychotropic medication." (AR 25.)

The ALJ erred in rejecting Dr. Wozniak and Ms. Henry-Berry's opinion. First, it is not enough to state that a treating physician's opinion is inconsistent with objective findings. *See Embrey*, 849 F.2d at 421 ("To say that medical opinions are not supported by sufficient objective findings ... does not achieve the level of specificity our prior cases have required.").) The ALJ's conclusory statement that the opinions of Dr. Wozniak and Ms. Henry-Berry are inconsistent with the above-discussed largely normal findings on mental status evaluation is not "specific." *See id*. The ALJ also erred to the extent he rejected the treaters' opinions because they were inconsistent with the opinions of the ME and non-examining consultants. *See Morganti v. Colvin*, No. C 12-03511 CRB, 2013 WL 1758784, at *6 (N.D. Cal. Apr. 24, 2013) ("rejecting [Plaintiff's] treating physicians' opinions simply because they are 'inconsistent' with a non-examining physician's opinion is not a legitimate and specific reason."); s*ee also Embrey,* 849 F.2d at 421 ("We have made it clear that the medical opinions of a claimant's treating physicians are entitled to special weight and that, if the ALJ chooses to disregard them, he must set forth specific legitimate reasons for doing so, and this decision must itself be based on substantial evidence."); *accord Orn*, 495 F.3d at 631.

Second, the ALJ found that the treaters' assessment of Plaintiff as markedly limited

contradicted Ms. Henry-Berry's own treating notes; however, the ALJ failed to identify which of Ms. Henry-Berry's treatment notes were contradictory, nor did he provide an interpretation of the evidence that led to his finding. (AR 25.) Instead, he summarily stated his conclusion without providing his own interpretation, and an explanation of why he, rather than the treating doctors, was correct. This is insufficient. *See Embrey*, 849 F.2d at 421–22; *Cotton*, 799 F.2d at 1408. Indeed, Ms. Henry-Berry's treating notes leading up to the second assessment repeatedly referenced the severity of Plaintiff's depression and the extent to which it limited his functioning. (AR 635, 641, 644, 649.)

Third, the ALJ stated that he was assigning little weight to the treaters' assessment because their opinion that Plaintiff was markedly limited in all categories was contradicted by Plaintiff's "relatively intact daily activities, and documented significant improvement on psychotropic medication." (AR 25.) In reaching this conclusion, the ALJ recharacterized and ignored evidence in the record. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (stating it is error for an ALJ to ignore or misstate the competent evidence in the record in order to justify her conclusion). For example, the ALJ stated that Plaintiff's ability to "attend mental health appointments" without noted difficulty interacting with clinicians" was indicative of his relatively intact daily functioning. (AR 23.) However later in his analysis the ALJ cites Plaintiff's "history of missing or cancelling appointments" to suggest "that his symptoms were not so severe as to require regular or frequent treatment." (AR 24.) The ALJ also ignored the many treatment notes that indicated Plaintiff did indeed have significant difficulties in his daily functioning. Specifically, notes that indicate Plaintiff frequently isolated himself and had trouble leaving his house (AR 486, 641, 647, 648, 649, 653), had trouble accomplishing "basic tasks like doing laundry" (AR 653), generally struggled with "day to day living" (AR 625 ), had trouble managing his own funds (AR 477), and overall, experienced "significant functional impairment due to depression. (AR 629.)

The ALJ's conclusion that Plaintiff enjoyed "significant improvement" on psychotropic medication is also unsupported by the record. (AR 25.) In support of this finding, the ALJ focused exclusively on Plaintiff's hearing testimony that he had experienced some improvement in

his symptoms as a result of his medication, as well as two instances in the record in 2014 where Plaintiff said he had "more good days than not" and was unwilling to make a medication change—which the ALJ inferred to mean that Plaintiff's symptoms were well controlled on the original dose. (AR 23.) However, the record as whole reflects that Plaintiff experienced at most varying degrees of relief on medication, even after numerous increases in medication dosage, as indicated by both Dr. Wozniak and Ms. Henry-Berry's treatment notes. (AR 647, 649, 653.) Dr. Wozniak's notes during Plaintiff's last session do not indicate that Plaintiff enjoyed "significant improvement":

> [Plaintiff] reports depressed mood since last visit (actually ongoing for months) associated with lack of interest, insomnia, easy fatigue and poor concentration. It is moderate to severe such that [Plaintiff] struggles to accomplish basic tasks like doing laundry. He has not found anything to make the symptoms more mangeable aside from meds and these have only worked partially despite being on maximum recommended doses . . . Depressive symptoms persist despite fairly consistent med (sic) adherence. Significant functional impairments as a result.

(AR 653.) In fact, Dr. Wozniak and Ms. Henry-Berry completed Plaintiff's second assessment— in which they assessed him as being markedly limited in all categories—after Dr. Wozniak increased Plaintiff's medications to the highest possible doses. (AR 600-602, 647.) The record thus does not support the ALJ's perfunctory conclusion that Plaintiff had enjoyed significant improvement on psychotropic medication; Dr. Wozniak and Ms. Henry-Berry's statements that Plaintiff's depression was "improving" were not sufficient to undermine their repeated diagnosis of his condition. *Holohan*, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

***

The Court therefore concludes that the ALJ erred by cherry-picking and relying only on portions of Plaintiff's medical record which bolstered his findings, and by failing to provide specific and legitimate reasons for disregarding the opinions of Dr. Wozniak and Ms. Henry-Berry in favor of Dr. Simonds and the non-examining consultants. *See Holohan*, 246 F.3d at 1207-08.

## II.     Reversal or Remand

In light of the ALJ's legal error in considering the medical evidence, the Court must determine whether to remand for further proceedings or with instructions to award benefits.  A district court may "revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id*. (citation omitted).

A district court is precluded from "remanding a case for an award of benefits unless certain prerequisites are met." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (internal citations and quotations omitted).  "The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence." *Id*. (citation omitted). "If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved." *Id*. (internal quotation marks and citation omitted).  If the record has been so developed, "the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true." *Id*.  If the answer is yes, "the district court may exercise its discretion to remand the case for an award of benefits." *Id*.  Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *Id*., and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12–CV6179, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).).

Notably, district courts "retain 'flexibility' in determining the appropriate remedy [.]" *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021). Specifically, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id*. (quoting *Garrison*, 759 F.3d at 1021); *see also Connett v. Barnhart*,

340 F.3d 871, 874-76 (9th Cir. 2003) (finding that a reviewing court retains discretion to remand for further proceedings even when the ALJ fails to "assert specific facts or reasons to reject [the claimant's] testimony").)

Here, the Court finds that the record creates doubt that Plaintiff is in fact disabled such that further administrative proceedings could address the inconsistencies, conflicts, and potential gaps in the record. *See Dominguez*, 808 F.3d at 410 (citations omitted). Accordingly, the Court does not proceed to the next question of whether the ALJ would be required to find Plaintiff disabled if the treating physicians' opinions were credited as true, and instead remands for further proceedings consistent with this Order.[8]

## CONCLUSION

For the reasons described above, the ALJ erred in failing to provide specific, legitimate reasons for discounting the opinions of treating physician, Dr. Wozniak and treating therapist, Ms. Henry-Berry, instead giving the most weight to the opinion of the ME, Dr. Simonds, and the State agency non-examining consultants.

Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 11). The Court VACATES the ALJ's final decision and REMANDS for further proceedings in accordance with this Order.

This Order disposes of Docket Nos. 11 & 17.

**IT IS SO ORDERED.**

Dated: April 14, 2017

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

---

[8] The Court notes that Plaintiff appears to have abandoned his initial request for remand for an award of benefits. (*See* Dkt. Nos. 11 & 18.)